SHERIDAN BROADCASTING NETWORKS, INC., and Ronald R. Davenport, Jr.

v.

NBN BROADCASTING, INC., and Sydney L. Small.

Appeal of NBN BROADCASTING, INC.

SHERIDAN BROADCASTING NETWORKS, INC., and Ronald R. Davenport, Jr.

v.

NBN BROADCASTING, INC., and Sydney L. Small.

Appeal of NBN BROADCASTING, INC.

Superior Court of Pennsylvania.

Argued Dec. 17, 1996.
Filed April 28, 1997.

---

990

Charles Kirshner, Pittsburgh, for appellant.

Joseph A. Katarincic, Pittsburgh, for appellees.

Before DEL SOLE, POPOVICH and HESTER, JJ.

POPOVICH, Judge:

This is an appeal from the May 6, 1996, order of the Court of Common Pleas of Allegheny County granting Sheridan Broadcasting, Incorporated's (Sheridan) motion for a preliminary injunction,[1] enjoining NBN Broadcasting, Inc. (NBN) from obstructing and injuring the business and operations of the American Urban Radio Networks (AURN), a partnership formed by Sheridan and NBN.[2] On appeal, NBN argues that the lower court erred in granting the preliminary injunction for the following reasons: (1) The record failed to establish that Sheridan had a clear right to the relief requested; (2) The preliminary injunction improperly altered the status quo; (3) The record failed to establish irreparable harm; (4) Sheridan failed to come before the lower court with "clean hands." [3] We affirm those paragraphs of the preliminary injunction preventing NBN from interfering with employee relations and seizing confidential documents from Davenport, Jr.'s office. However, we reverse those paragraphs of the preliminary injunction preventing NBN from interfering with the relocation of AURN's New York City office and the billing department.

The facts viewed in the light most favorable to Sheridan, the winner at the lower court level, are as follows: AURN was formed for the primary purpose of marketing and selling commercial advertising time on Sheridan and NBN's radio networks. The partnership agreement, dated December 13, 1991, provided that "operations of the partnership shall be the responsibility of a five-member management committee." The five-member committee was comprised of two members representing Sheridan, two members representing NBN, and a fifth seat which remained vacant until there was a voting deadlock, at which time Ronald R. Davenport, Sr., was authorized to appoint a fifth member. On October 16, 1995, by a vote of three to two, the management committee voted to hire Skip Finley and Richard Boland. On November 28, 1995, by a vote of three to two, the management committee voted to move AURN's New York City office to Washington, D.C., to move the billing department in New York City to AURN's Pittsburgh office, and to authorize the chief operating officer to review the operations of the marketing department and make necessary personnel changes.[4]

NBN was dissatisfied with the management committee's adoption of the resolutions. NBN then engaged in a pattern of conduct designed to disrupt and impede the implementation of the resolutions. Specifically, NBN interfered with employee relationships. NBN contacted AURN's payroll company and threatened legal action if the company issued paychecks to Finley and Boland. As a result, the payroll company refused to process payroll checks for any of AURN's employees. On April 15, 1996, NBN purported to fire unilaterally Finley, Boland and Davenport, Jr., and hired security guards to prevent them from entering AURN's New York City office building. On April 16, 1996, NBN

1. Ronald R. Davenport, Jr., joined in Sheridan's motion for a preliminary injunction. We further note that both Sheridan and Davenport, Jr., filed a motion to vacate the May 6, 1996, order, which was denied. Sheridan and Davenport, Jr., then appealed the order granting the preliminary injunction and the order denying their motion to vacate. These appeals were consolidated.

2. The lower court's May 6, 1996, order granting the preliminary injunction contains nineteen paragraphs and is both prohibitory and mandatory in nature. The injunction is prohibitory in that it forbids NBN from engaging in certain wrongful acts. It is mandatory in that it compels NBN to perform certain acts. 42 Am Jur 2d, Injunctions, § 9. *See Sovereign Bank v. Harper,* 449 Pa.Super. 578, 674 A.2d 1085 (1996). Paragraphs one, two, three, five, six, seven, seventeen, and eighteen of the preliminary injunction prevent NBN from interfering with employee relations and from seizing confidential documents from Davenport, Jr.'s office. Paragraphs four and eight through sixteen of the preliminary injunction prevent NBN from interfering with the relocation of AURN's office in New York City to Washington, D.C. and the relocation of the billing department in New York City to Pittsburgh, Pennsylvania.

3. We have re-numbered NBN's arguments for the sake of effective appellate review.

4. The management committee's initial voting on the aforementioned resolutions resulted in voting deadlocks. Accordingly, a third member, Davenport, Jr., was appointed to break the voting deadlocks, resulting in the adoption of the resolutions by votes of three to two.

broke into a locked cabinet in Davenport Jr.'s office in order to remove confidential attorney-client documents. NBN also prevented AURN employees in the Pittsburgh office from communicating with AURN employees in the New York City and Chicago offices.

Moreover, NBN prevented the transmission of sales orders and interfered with the operation of the billing department in AURN's Pittsburgh office. After the billing department was relocated to Pittsburgh, NBN contacted the Radio Computing Service (RCS), the service which supplied AURN with the computer program used by the billing department, and requested that the computer program be installed in NBN's New York City office. In response, RCS contacted Sheridan and threatened legal action. NBN then refused to send its billing or advertising information to the Pittsburgh office.

NBN also interfered with the relocation of AURN's New York City office to Washington, D.C. While Sheridan was negotiating with a realtor in Washington, D.C., NBN contacted the realtor and threatened legal action if the realtor entered into a lease agreement with AURN. NBN also published an article in a trade publication claiming that AURN was not empowered to enter into a lease agreement without NBN's express consent.

■ On May 3, 1996, Sheridan filed a complaint and a motion for a preliminary injunction in the lower court, which was granted. Following the denial of NBN's motion to vacate the preliminary injunction, this appeal followed.

[A]n appellate court's review of the grant or denial of a preliminary injunction is limited to a determination of whether any apparently reasonable grounds existed for the action taken by the trial court; appellate courts will not review the merits of the controversy itself. The Superior Court may interfere with [the lower court's] decision regarding a preliminary injunction only if the certified record reveals that no grounds exist to support the decree, or that the rule of law relied upon was either palpably erroneous or misap-

plied. In order to sustain a preliminary injunction, *the plaintiff's right to relief must be clear, the need for relief must be immediate, and the injury must be irreparable if the injunction is not granted.*

*Sovereign Bank v. Harper,* 449 Pa.Super. 578, 674 A.2d 1085, 1091 (1996) (citations omitted) (emphasis in original).

■ NBN's first argument is that the record failed to establish that Sheridan had a clear right to the relief requested. NBN is correct in arguing that Sheridan must prove that it has a clear right to enjoin NBN's actions before it is entitled to injunctive relief. However, this does not mean that Sheridan must establish its claim absolutely. *Id.* "Pennsylvania law places the burden upon the party seeking the injunction to establish his or her own rights as well as the inequitable nature of the defendant's conduct. Nevertheless, the defendant must show that his or her conduct was reasonable or that a defense exists to the plaintiff's claim." *Id.,* 674 A.2d at 1092 (citations omitted).

At issue in this case is the interpretation of the partnership agreement. If, on the merits, Sheridan is able to prove that the partnership agreement permitted Davenport, Sr., to appoint Davenport, Jr., to vote on the resolutions at issue, and that NBN acted improperly in light of these resolutions, an equitable remedy would be available for any mishandling of the partnership by NBN. *Cappiello v. Duca,* 449 Pa.Super. 100, 672 A.2d 1373 (1996).

The certified record to this Court shows that the lower court was apprised fully of the agreement provisions at issue in this case, and that the lower court found that the language of the provisions was clear. NBN and Sheridan agreed that Section 5.2 of the partnership agreement provided that "the management committee shall be responsible for the following functions of the partnership and contractual arrangements relating thereto: (i) sales and marketing; (ii) promotions and public relations; (ii) affiliate relations and compensation; (iv) network programming; (v) personnel administration; and, (vi) budgeting, accounting and finance." They also agreed that Section 5.3 of the partner-

ship agreement provided that "in the event that three of the four members of the management committee are unable to reach agreement on any issue or issues relating to items (i) through (v) above and remain so unable for a period of thirty days, then Ronald R. Davenport, Sr., shall have the right to fill the vacant seat for the purpose of reaching an agreement, on such issue or issues." If the subject related to "budgeting, accounting and finance," Davenport, Sr., was not permitted to fill the vacant seat.

Both parties further agreed that the resolution adopted at the October 16, 1995, meeting called for the hiring of two new employees, Finley and Boland. Sheridan presented substantial evidence that giving the express, unambiguous language of the partnership agreement its plain meaning, the hiring of the employees related to "personnel administration," a subject properly addressed by the committee. *Ress v. Barent,* 378 Pa.Super. 397, 548 A.2d 1259 (1988) (the writing itself that is to determine the rights and liabilities of the parties, and, where the language of the contract is clear, the court is required to give words their plain meaning). Sheridan also presented substantial evidence that since the management committee was permitted to vote on matters concerning "personnel administration," and the committee deadlocked on this issue, Davenport, Sr., was permitted to appoint Davenport, Jr., to break the voting deadlock as to the hiring of Finley and Boland. Moreover, Sheridan presented substantial evidence that NBN's hiring of security guards to prevent the employees from entering AURN's New York City office, attempting to fire the employees, and refusing to compensate the employees for their services was inequitable.

NBN argued that it had a defense to Sheridan's claim in that the hiring of the employees and the payment of their compensation related to "budgeting, accounting and finance," and, therefore, Davenport, Sr., was

not permitted to appoint Davenport, Jr., to break the deadlock. Accordingly, NBN argued that its activities were justified.

▮ In light of the pertinent evidence and the applicable law, we find that the lower court had a reasonable basis to find that the hiring of the employees was related to "personnel administration," that the management committee was permitted to vote on matters related to "personnel administration," that the committee deadlocked on this issue, and that Davenport, Sr., was permitted to appoint Davenport, Jr., to break the voting deadlock. We further find that the lower court reasonably concluded that NBN acted improperly in light of the committee's resolution by preventing the employees from entering their offices, by refusing to compensate them for their services, and by attempting to fire them. Accordingly, we find that Sheridan proved that it had a clear right to relief regarding this resolution.[5]

▮ The next resolutions at issue were adopted by the management committee on November 28, 1995. Both parties agreed that the resolutions called for the relocation of AURN's New York City office to Washington, D.C., and the relocation of the billing department in New York City to AURN's Pittsburgh office. The trial court's preliminary injunction relating to these resolutions enjoined NBN from interfering with the relocation of the New York City office or the billing department and interfering with RCS's contractual relationship with AURN regarding the billing department's computer program. The preliminary injunction also directed NBN to return all copies of RCS's computer program to the Pittsburgh office and to provide the Pittsburgh office with all information regarding the scheduling of advertisements and the billing of clients.

At the hearing, Sheridan argued that under the dictates of the partnership agreement, the relocation of AURN's offices and

---

5. We note that NBN also attempted to fire Davenport, Jr., prevented him from entering AURN's New York City office, and prevented the payment of his salary. We find that this was error and that Sheridan established that it had a clear right to relief regarding this issue. We also find that Davenport, Jr., proved that he had a clear right

to relief regarding NBN's seizure of confidential attorney-client documents from his office. The documents were prepared by Davenport, Jr., who is an attorney, for the benefit of Sheridan and in anticipation of litigation between Sheridan and NBN. There is no indication that NBN was entitled to these documents.

departments did not relate to "budgeting, accounting and finance." Therefore, Sheridan argued that Davenport, Sr., was permitted to appoint Davenport, Jr., to break the voting deadlocks concerning these resolutions.

NBN presented substantial evidence that giving the express, unambiguous language of the partnership agreement its plain meaning, Section 5.2 of the partnership agreement did not list the relocation of offices or departments as proper functions of the management committee. NBN argued that while the relocation of the offices and departments might not relate to "budgeting, accounting and finance," it also did not relate to any of the other functions listed in Section 5.2. Moreover, NBN presented substantial evidence that pursuant to Section 1.3 the "partnership" was authorized to determine the place or places of business. Therefore, NBN argued that the authority to relocate offices and departments was not given to the management committee under the express dictates of Section 5.2 and 1.3, and that the voting and implementation of these resolutions by the management committee was improper. Accordingly, NBN argued that it had a defense to Sheridan's claim and that its refusal to abide by the resolutions was reasonable.[6]

■ We agree with NBN's arguments and find that the lower court did not have reasonable grounds to conclude that the management committee was permitted to relocate AURN's office and billing department. We note that while Sheridan argued that the relocation of offices and departments was not related to "budgeting, accounting and finance," it offered virtually no evidence that

relocation was related to any of the other functions listed in Section 5.2.[7] Therefore, we find that Sheridan failed to show that it had a clear right to relief regarding the relocation of the New York City office and the billing department, and that the lower court erred in enjoining NBN's actions in contravention thereof. The certified record reveals that no grounds exist to support those paragraphs of the preliminary injunction relating to the relocation of the office and billing department.

Having found that Sheridan demonstrated a clear right to relief regarding the hiring of Finley and Boland and NBN's seizure of the confidential documents, we must determine whether Sheridan also demonstrated that the lower court's order preserved the status quo and whether Sheridan demonstrated the possibility of irreparable injury with respect thereto.

The purpose of a preliminary injunction is to put and keep matters in the position in which they were *before* the improper conduct of the *defendants* commenced and to prevent them from gaining any advantage by their own wrongful acts. *Three Co. Services v. Philadelphia Inquirer*, 337 Pa.Super. 241, 486 A.2d 997 (1985). "[A] preliminary injunction is designed to preserve the subject of the controversy in the condition in which it is when the order is made, it is not to subvert, but to maintain the existing status quo until the legality of the challenged conduct can be determined on the merits." *In re Appeal of Little Britain*, 651 A.2d 606, 611 (Pa.Cmwlth. Ct.1994) (citation omitted).

■ In this case, we conclude that the preliminary injunction would have the effect of restoring the status quo prior to NBN's

---

**6.** There is no evidence in the record that the "partnership" and the "management committee" were comprised of the same individuals.

**7.** In regard to the relocation of the office and the billing department, the lower court's preliminary injunction compelled NBN to provide Sheridan with the billing information and sales information for past accounts. It also compelled NBN to return all copies of the billing department's computer program to the Pittsburgh office. As previously discussed, these provisions of the injunction are mandatory since they compel NBN to perform certain acts. "Because a mandatory

injunction compels the defendant to perform an act, rather than merely refraining from acting, courts will only grant a mandatory injunction upon a very strong showing that the plaintiff has a clear right to relief." *Sovereign*, 674 A.2d at 1092 (citation omitted). Accordingly, in order for us to find that the lower court did not abuse its discretion in granting Sheridan's request for relief regarding the relocation of the New York City office and the billing department, it was necessary for Sheridan to prove a very strong showing that it had a "clear right" to the relief requested.

unilateral attempts to fire AURN employees, prevent the payment of compensation to AURN employees, and NBN's seizure of confidential documents from Davenport, Jr.'s office. As the lower court found, AURN is a partnership equally controlled by NBN and Sheridan. Resolutions regarding personnel administration were made by the partnership's management committee, and the wrong in this case occurred when NBN engaged in activities designed to obstruct and injure the operations of AURN after the resolution was implemented. Therefore, the lower court's order properly preserved the status quo by preventing NBN's activities until the merits of the dispute could be litigated.

■ NBN next maintains that Sheridan failed to establish irreparable harm.[8] "An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard." *Sovereign*, 674 A.2d at 1093 (citation omitted). The plaintiff must demonstrate the likelihood of a loss that is not entirely ascertainable and compensable by money damages. *John G. Bryant Co. v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164 (1977).

■ Sheridan argued that NBN's actions threatened them with the potential loss of customers, profits, good will, and market advantages due to NBN's refusal to compensate employees or permit them access to their offices. In the commercial context, the impending loss of business opportunities or market advantages may aptly be characterized as "irreparable injury" for this purpose. *Sovereign, supra*. We conclude that the lower court had a reasonable basis to conclude that NBN's interference with employee relationships would irreparably harm Sheridan. *Sovereign, supra; John G. Bryant Co., supra* (the unwarranted interference with employee relationships constitutes irreparable harm). It is virtually impossible to value the impending loss of business opportunities or market advantages resulting from NBN's interference. *See Courier Times, Inc. v. United Feature Syndicate, Inc.*, 300 Pa.Super. 40, 445 A.2d 1288 (1982) (plaintiff showed irreparable harm where loss of popular syndicated column would result in lost market advantages).

For example, the record demonstrates that before NBN began interfering with Finley and Boland's employment, the employees were in the midst of creating new radio shows, establishing new telephone services, and implementing new marketing techniques for AURN. Also, the record demonstrates that because of NBN's interference, none of AURN's employees were being compensated for services rendered. It was unlikely that employees would continue working for AURN without compensation, and, therefore, it was unlikely that AURN would be able to continue its business operations. "In almost all commercial enterprises, contact with customers, clientele, and employees is a particularly sensitive aspect of the business." *John G. Bryant Co.*, 369 A.2d at 1167 (citation omitted).

We also find that the record supports the lower court's conclusion that Sheridan and Davenport, Jr., would be irreparably harmed if NBN failed to return confidential attorney-client documents it seized from Davenport, Jr.'s office or if NBN was permitted to continue searching and seizing documents from Davenport, Jr.'s office. It is impossible to calculate the damage Sheridan or Davenport, Jr., would suffer if they did not have access to the documents prepared for litigation.

---

8. In its brief, NBN argued, without citation to authority, that it was improper for Sheridan to allege that NBN's actions caused Sheridan irreparable harm since NBN's actions were directed at AURN and not at Sheridan. We find this argument to be specious. Sheridan owns 51% of AURN and NBN owns 49% of AURN. Clearly, any actions which caused irreparable harm to AURN also caused irreparable harm to Sheridan. This is the very nature of a partnership. Black's Law Dictionary 1009 (5th ed. 1979) (defining "partnership" as "[a] voluntary contract between two or more competent parties to place their money, effects, labor, and skill or some or all of them, in lawful commerce or business, with the understanding that there shall be a proportional sharing of the profits and losses between them."). In addition, case law reveals that, assuming all of the requirements are met, a preliminary injunction is a proper remedy where one partner seeks to enjoin the actions of another partner. *See Cappiello, supra* (lower court granted a preliminary injunction in favor of one partner in order to prevent the other partner from withdrawing funds out of the partnership's account).

NBN's final contention is that Sheridan failed to come before the lower court with "clean hands." This issue was not presented to the lower court. Therefore, it has been waived on appeal. *Dollar Bank v. Swartz*, 540 Pa. 369, 657 A.2d 1242 (1995).

For all of the foregoing reasons, we affirm paragraphs one, two, three, five, six, seven, seventeen, eighteen, and nineteen[9] of the lower court's May 6, 1996, order granting the preliminary injunction. These paragraphs prevent NBN from interfering with employee relations and from seizing confidential documents from Davenport, Jr.'s office. The remaining paragraphs of the order are reversed since Sheridan and Davenport, Jr., failed to establish a clear right to the relief requested with regard thereto.

Affirmed in part; reversed in part; jurisdiction relinquished.

DEL SOLE, J., did not participate in the consideration or decision of this case.

---

9. We note that paragraph nineteen of the preliminary injunction order compels either Sheridan or Davenport, Jr., to file a bond. The propriety of this paragraph has not been challenged on appeal.